

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

AGUSTIN BOJORQUEZ-MORENO,
et al.,

      Plaintiffs,

v.                        Civil Action No. 3:14cv670

SHORES & RUARK SEAFOOD
COMPANY, INC., et al.,

      Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the Defendants' RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS (Docket No. 11). For the reasons stated below, this motion will be granted.

## BACKGROUND

The Plaintiffs are five Mexican citizens who traveled from Mexico to Virginia to work for the Defendants under the H-2B work visa program. (Compl. ¶ 1.) Specifically, this temporary work consisted of shucking oysters found in the Rappahannock River in Urbanna, Middlesex County, Virginia. (Compl. ¶¶ 17-19, 42, 48-50.) The nature of the job is to remove oysters from their shells by using a shucking knife to pry open the shell and cut the oyster loose from it.

The H-2 work visa program allows an employer in the United States to import foreign guest workers to perform unskilled labor of a temporary nature if the U.S. Department of Labor ("DOL") certifies that there are insufficient available workers in the United States to perform the job.  See 8 U.S.C. § 1101(a)(15)(H)(ii); (Compl. ¶ 25.).  The H-2 program is divided into two separate visa categories; the H-2A program authorizes the seasonal employment of foreign workers to perform agricultural labor or services, while the H-2B program authorizes the employment of foreign workers to perform nonagricultural work.  See 8 U.S.C. § 1101(a)(15)(H)(ii); 8 CFR § 214.2(h)(1)(ii)(D).  The Plaintiffs in this case were admitted to the United States under H-2B visas.  (Compl. ¶¶ 7-12.)  In connection with the oyster shucking work that Plaintiffs performed for Defendants pursuant to their H-2B visas, Plaintiffs have asserted four counts against Defendants related to a purported failure to properly pay Plaintiffs' minimum wages and to provide the appropriate number of work hours. Specifically, Plaintiffs allege:  (1) violations of the minimum wage provisions of the Fair Labor Standards Act (Count I); (2) violations of the Migrant and Seasonal Agricultural Worker Protection Act (Count II); (3) a breach of employment contract under state law (Count III); and (4) a third-party beneficiary claim for breach of contract under state law (Count IV).

## DISCUSSION

### I.  Legal Standard

When deciding a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), the Court applies the same standard that is applied when ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Burbach Broad. Co. v. Elkins Radio Corp., 278 F.3d 401, 405-06 (4th Cir. 2002); Walker v. Kelly, 589 F.3d 127, 139 (4th Cir. 2009). The Court must assume that the allegations in the non-moving party's pleadings are true and construe all facts in the light most favorable to the non-moving party. Burbach Broad. Co., 278 F.3d at 406. Judgment should be entered in favor of the movant when the pleadings "fail to state any cognizable claim for relief, and the matter can, therefore, be decided as a matter of law." Thomas v. Standard Fire Ins. Co., 414 F. Supp. 2d 567, 570 (E.D. Va. 2006) (citation omitted).

### II.  Count I: Fair Labor Standards Act

In Count I, Plaintiffs allege that Defendants, Shores & Ruark Seafood Company, Inc., Urbanna Seafood Company, Inc., and Rufus H. Ruark, Jr., (collectively, "S&R") violated the minimum wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206(a), by failing to pay Plaintiffs at least $7.25 for every compensable hour of labor performed during each workweek

they were employed and by S&R's requirement that Plaintiffs purchase their work tools. (Compl. ¶¶ 59, 61.)

S&R requests that this claim be dismissed only in part based on the statute of limitations. (Defs.' Mem. at 5-6.) The statute of limitations for claims under the FLSA is two years, unless a plaintiff can prove that the defendants acted willfully. See 29 U.S.C. § 255(a); McLaughlin v. Richland Shoe Co., 486 U.S. 128, 135 (1988) ("Ordinary violations of the FLSA are subject to the 2-year limitations period."); Gaxiola v. Williams Seafood of Arapahoe, Inc., 776 F. Supp. 2d 117, 127 (E.D.N.C. 2011). If willfulness is shown, then the statute of limitations is increased to three years. Id. Plaintiffs do not contest that the statute of limitations bars violations occurring more than three years before the date of filing. (Pls.' Resp. at 3.) In their response, Plaintiffs "clarify" that they do not seek unpaid wages or liquidated damages for any violations of the FLSA committed before September 30, 2011. Id. Defendants point out that this "clarification" is not found in the Complaint and reiterate that Count I should be dismissed to the extent it seeks recovery for violations occurring prior to September 30, 2011. (Defs.' Reply at 2.)

Because the limitation acknowledged by Plaintiffs is not found in the Complaint, the motion to dismiss Count I in part will be granted.

### III. Count II: Migrant and Seasonal Agricultural Worker Protection Act

In Count II, Plaintiffs allege S&R violated 29 U.S.C. § 1822(c), 29 U.S.C. § 1821(d)(2), and 29 U.S.C. § 1821(a) of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA") and that each of these violations were "intentional" within the meaning of 29 U.S.C. § 1854(c)(1). (Compl. ¶¶ 66-70.)

S&R contends that the protections of the AWPA do not apply to Plaintiffs for two primary reasons: (1) the AWPA does not apply to H-2B visa workers; and (2) oyster shucking is nonagricultural and therefore does not fall within the purview of the AWPA. (Defs.' Mem. at 6, 10-13.) S&R also cites to several statutory definitions of "agricultural" that would appear to exclude the process of shucking oysters. (Defs.' Mem. at 7-9.)

Plaintiffs respond that the AWPA not only applies to workers who perform agricultural labor as defined in the Internal Revenue Code ("IRC"), 26 U.S.C. § 3121(g), and FLSA, 29 U.S.C. § 203(f), but also provides coverage for workers who are engaged in a third definition of "agricultural employment": "the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state." 29 U.S.C. § 1802(3). Plaintiffs argue that this third,

broader, category can extend to H-2B workers (even if deemed "nonagricultural" under immigration law) and covers the oyster shucking performed by Plaintiffs. (Pls.' Resp. at 3-12.) To support this contention, Plaintiffs cite to the "test" established in Morante-Navarro v. T&Y Pine Straw, Inc., 350 F.3d 1163 (11th Cir. 2003), and point to various federal, state, and regulatory provisions that incorporate seafood into their definitions of an "agricultural commodity."

S&R's first contention is a categorical one:  that the AWPA does not apply to H-2B visa workers because the AWPA applies only to "migrant agricultural workers," 29 U.S.C. § 1801, and the H-2B visa, which is the one held by the Plaintiffs, only "applies to an alien who is coming temporarily to the United States to perform nonagricultural work of a temporary or seasonal nature."  See 8 CFR § 214.2(h)(1)(ii)(D); see also Garcia v. Frog Island Seafood, Inc., 644 F. Supp. 2d 696, 702 n.2 (E.D.N.C. 2009) ("The H-2A program authorizes the seasonal employment of foreign workers to perform agricultural work, while the H-2B program authorizes the employment of foreign workers to perform non-agricultural work.").  To support this view, S&R points out that the AWPA expressly excludes coverage for H-2A workers and argues that H-2B workers are not mentioned because such visas are, by definition, "nonagricultural."

6

This categorical argument has considerable force, but is not entirely convincing. First, the Plaintiffs point out that the AWPA and Immigration and Nationality Act ("INA") define "agricultural" employment differently. Thus, a worker could be "nonagricultural" for purposes of the H-2B designation, but agricultural for purposes of AWPA coverage. Therefore, say the Plaintiffs, the absence of an express exclusion for H-2B workers does not reflect any redundancy, but rather means that H-2B workers *are not excluded* from coverage under the AWPA as H-2A workers are. The Plaintiffs then cite various decisions in which courts have permitted H-2B workers to enforce their rights under the AWPA. See De Leon-Granados v. Eller and Sons Trees, Inc., 497 F.3d 1214 (11th Cir. 2007) (affirming class certification of H-2B workers' AWPA claims); Morante, 350 F.3d at 1172 (concluding that H-2B pine straw workers are covered by the AWPA); Rosiles-Perez v. Superior Forestry Service, Inc., 652 F. Supp. 2d 887 (M.D. Tenn. 2009) (holding employer of H-2B workers liable for violation of protective order in case with underlying AWPA claims); Recinos-Recinos v. Express Forestry, Inc., No. 05-1355, 2008 WL 4449973 (E.D. La. 2008) (requiring employers to pay H-2B workers damages under AWPA). The Plaintiffs also cite to regulations (that have admittedly been held invalid by a sister district) that require an agent to submit a copy of its AWPA registration certificate in

7

conjunction with the filing of an application for H-2B visas. See 20 C.F.R. § 655.8(b), held invalid by Bayou Lawn & Landscape Servs. v. Perez, No. 3:12CV183/MCR/CJK, 2014 WL 7496045, at *6 (N.D. Fla. Dec. 18, 2014) ("DOL lacks authority to engage in legislative rulemaking under the H-2B program.  The 2012 Rule, therefore, must be vacated.").

The parties also provide a mixed bag of statutory and regulatory definitions to demonstrate or refute the propriety of including seafood within the definition of an "agricultural commodity" or seafood processing within the definition of "agriculture."  For example, S&R cites to the definitions of "agriculture" in the FLSA and IRC – two definitions that are referenced in the AWPA's own definition of "agricultural employment."  These definitions discuss, for example, "the raising of livestock, bees, fur-bearing animals, or poultry," 29 U.S.C. § 203(f), or "cultivation, growing, and harvesting" and "products of the soil," 29 C.F.R. § 780.112, which reflect a focus on land-raised products.  The FLSA definition also expressly excludes "commodities produced by industrial techniques . . . or by uncultivated natural growth." 29 C.F.R. § 780.112.

Plaintiffs, on the other hand, cite several definitions of "agricultural commodity" that have included fish, seafood, or shellfish, such as the Food for Peace Act, the Trade Act of

1974, and the Child Nutrition Act of 1966.  These conflicting sources demonstrate that Congress knows how to include seafood within its definition if it so desires, but do not necessarily shed light on whether Congress intended a process such as oyster shucking to fall within the purview of "agricultural employment" for purposes of the AWPA.

Thus, the best resolution lies in the text, legislative history, and judicial interpretations of the AWPA itself.  And, that analysis tells courts that, "[i]n construing statutes, our primary goal is to give effect to congressional intent."  United States v. Hager, 721 F.3d 167, 209 (4th Cir. 2013) cert. denied, 134 S. Ct. 1936 (2014) (citing NLRB v. Wheeling Elec. Co., 444 F.2d 783, 787 (4th Cir.1971)).

The first step in construing congressional intent is to look to the plain language of the statute.  Plaintiffs rely heavily upon the court's reasoning in Morante to advance their claim, but fail to recognize that the Morante court began its inquiry by recourse to the words' "ordinary, contemporary, common meaning."  Morante, 350 F.3d at 1167 (citing Perrin v. United States, 444 U.S. 37, 42 (1979)).  In so doing, the Eleventh Circuit relied upon the following for guidance:

> Webster's Dictionary defines "agriculture" broadly as "the science or art of the production of plants and animals useful to man and in varying degrees the preparation of the products for man's use and their

9

> disposal (as by marketing)." Webster's
> Third New International Dictionary 44
> (1986); see also Black's Law Dictionary 69
> (7th ed. 1999) (agriculture is "the science
> or art of cultivating soil, harvesting
> crops, and raising livestock"); 3 Am. Jur.
> 2d Agriculture § 1, at 768 (2002)
> (agriculture includes "preparing soil,
> planting seeds, raising and harvesting
> crops, . . . gardening, horticulture,
> viticulture, dairying, poultry, bee raising,
> ranching, riding stables, firewood
> operations, and landscape operations").

Morante, 350 F.3d at 1168. Shucking oysters would not find home in the common usage of "agriculture" based on the word's ordinary meaning. This alone might exclude Plaintiffs' approach. In fact, even the Morante court – which found that "the raking, gathering, baling, and loading of pine straw may fall within these broad definitions of agriculture" – nonetheless questioned whether "the pine straw at issue in this case" could constitute an "agricultural commodity" under the AWPA. Morante, 350 F.3d at 1168. Thereupon, the Morante court moved to the history and purpose of the statute.

The AWPA was preceded by the Farm Labor Contractor Registration Act of 1963 ("FLCRA"). See Morante, 350 F.3d at 1168 ("When determining to whom Congress intended the act to apply, we look to the AWPA's predecessor, the Farm Labor Contractor Registration Act of 1963[.]"). Although the AWPA was "undoubtedly intended" to extend migrant worker protections, the original law – incorporating the FLSA and IRC definitions –

10

contained exemptions for seafood, and there is "no evidence that Congress . . . changed its mind" that agriculture was "limited to the land." Araiza-Calzada v. Webb's Seafood, Inc., No. 5:13CV15-RS-CJK, 2014 U.S. Dist. LEXIS 127021, *11-14 (N.D. Fla. Sept. 10, 2014).

Unlike the AWPA's incorporated FLSA and IRC definitions, which "have been construed to mean traditional agricultural work performed 'on a farm,'" Araiza, 2014 U.S. Dist. LEXIS 127021, at *10 (citing Morante, 350 F.3d at 1167), and which have been disclaimed by the Plaintiffs as a basis for their suit, (Pls.' Resp. at 6.), the AWPA's third definition borrowed the verbs describing agricultural activity in the FLSA and IRC definitions, while deemphasizing the location of those activities to ensure that the AWPA reached "agricultural employment" regardless of its location. See Morante, 350 F.3d at 1169; Bracamontes v. Weyerhauser Co., 840 F.2d 271, 275-76 (5th Cir. 1988); Bresgal v. Brock, 843 F.2d 1163, 1167-68 (9th Cir. 1987) ("The added language does refer to such functions as "packaging, processing, freezing, or grading," which were not in the original definition of agricultural labor.   But the amendment also covers the "handling, planting [or] drying" of agricultural commodities. These functions — if performed on a farm — are within the original definition of agricultural employment as derived from the [FLSA].   The inclusion of these

words in the amendment would be redundant if the amendment were not intended to place emphasis on the activity — any handling of an 'agricultural or horticultural commodity' — and to deemphasize the location of the activity."). As the Bresgal court noted, "it is inconceivable that Congress intended to protect workers planting fruit trees in an orchard, and to disregard workers planting fir trees on a hillside, when both groups suffer from the same clearly identified harm." 843 F.2d at 1166.

Although it is clear that activities "not fall[ing] within the FLSA and IRC prongs of § 1802(3) still may be encompassed in the third," Bracamontes, 840 F.2d at 276, the third definition is linked to the first two through the use of the conjunctive "and" rather than the disjunctive "or." 29 U.S.C.A. § 1802(3) ("The term 'agricultural employment' means employment in any service or activity included within the provisions of section 3(f) of the Fair Labor Standards Act of 1938 (29 U.S.C. 203(f)), or section 3121(g) of Title 26 and the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.") (emphasis added). The Araiza court argues that this shows the purpose of the third definition was to ensure that the definitions were not

12

narrowly interpreted to apply to farms.  Araiza, 2014 U.S. Dist. LEXIS 127021, at *16-17.

In addition, the inclusion of "downstream activity" verbs — such as "packaging, processing, freezing, or grading" – has been read to ensure coverage vertically along the chain of production.  See Bracamontes, 840 F.2d at 275 ("The vertical expansion of the act is plain[.]"); Morante, 350 F.3d at 1169 ("The purpose of the AWPA was to provide 'coverage to all aspects of commerce in agriculture.'") (citing S. Rep. No. 93-1295, 1974 U.S.C.C.A.N. at 6448).  In other words, the definition of "agricultural employment" expanded in two ways: (1) to reach agricultural activities performed regardless of location, and (2) to reach the downstream processing of agricultural products.[1]  Neither of these, however, reflects congressional intent to broaden the notion of an "agricultural commodity" to the extent envisioned by Plaintiffs.

Plaintiffs' strongest argument – or so they believe - derives from their interpretation of case law.  Specifically, the Plaintiffs point to language in Morante that they claim establishes a judicial "test" for determining whether an object is an "agricultural commodity" for the purposes of the AWPA.  In

---

[1]  The amendments to the definition also removed the original statute's restriction to "interstate" commerce, allowing the law to reach intrastate activity.  See Bresgal, 843 F.2d at 1167. This third change is not instructive to the interpretive question before the Court.

the closing lines of the _Morante_ opinion, the Eleventh Circuit observed that, "[l]ike tree seedlings, trees, evergreen boughs, and mushroom compost, pine straw is produced by a natural process that can be – and was in this case – enhanced by manual labor and cannot be put to commercial use without human intervention."   350 F.3d at 1172.   Based on this language, Plaintiffs argue that any item that is (1) produced by a natural process, (2) can be enhanced by manual labor, and (3) cannot be put to commercial use without human intervention is, therefore, an "agricultural commodity" under the AWPA.

Plaintiffs' interpretation misses the mark for several reasons.   First, the _Araiza_ court, which, as a district within the Eleventh Circuit, is bound to follow the _Morante_ opinion as mandatory authority, flatly stated that the _Morante_ court did not create any kind of overarching "agricultural commodity" test, but was "merely summarizing its reasoning," and held that the AWPA does not apply to oyster shucking.   _Araiza_, 2014 U.S. Dist. LEXIS 127021, at *22.   Second, all of the cases cited by the Plaintiffs discuss land-grown products.   Not one drives the notion of agriculture into the sea.   See _Morante_, 350 F.3d at 1172 (pine straw); _Bracamontes_, 840 F.2d at 276–77 (pine tree seedlings); _Bresgal_, 843 F.2d at 1166 (trees).   Third, even the _Bracamontes_ court, which examined the planting of pine tree seedlings, considered its opinion to be a boundary case.   See

14

*Bracamontes*, 840 F.2d at 273-74 ("The question is a close one and either of the interpretations urged are plausible."). Lastly, the "test" advocated by Plaintiffs would create an impossibly expansive notion of "agriculture" and lead to unreasonable results. As the Defendants observe, resources such as "water, oil, diamonds, and a host of other products" could become "agricultural commodities" under the Plaintiffs' proposed test. (Defs.' Mem. at 5 n.1.)

The plain text of the statute, its legislative history, and judicial decisions all counsel that neither shucking oysters nor those who shuck oysters are covered by the AWPA. If the definition of agricultural labor or agricultural employment is to be expanded to include this kind of activity, it is up to Congress to do so by amending the statute. It certainly is not the place of the Court to effect such a change under the guise of statutory interpretation. Absent explicit direction from Congress to the contrary, the Court concludes that, whatever the true bounds of agriculture may be, the definition likely stops at the water's edge and precludes Plaintiffs' claim. Hence, the motion to dismiss Count II will be granted.

## IV.  Count III: State Contract Claim

In Count III, the Plaintiffs allege that S&R offered to apply for and secure H-2B visas for Plaintiffs, that S&R did so

apply for labor certification under the H-2B visa program, and that an employment contract was created when Plaintiffs accepted S&R's offer by traveling from Mexico to Virginia and performing work. According to the Plaintiffs, the terms of the alleged contract included obligations that S&R told the DOL it would satisfy so that S&R could receive the labor certification from the DOL under the H-2B visa program. (Compl. ¶ 73.) Those terms are: (1) failing to pay the prevailing wage required by the H-2B regulations; (2) failing to provide 40 hours per week of work as required by the H-2B certifications; and (3) failing to pay Plaintiffs minimum wages as required by the FLSA. (Compl. ¶ 75.)

In sum, it is the Plaintiffs' theory that these requirements to which S&R agreed in applying for a labor certification are terms of their employment agreement with S&R. To support that theory, the Plaintiffs rely on a number of "H-2" cases in which so-called clearance orders (the forerunner of the labor certificates) were held to be part of foreign workers' contracts. See Salazar-Calderon v. Presidio Valley Farmers Ass'n, 765 F.2d 1334, 1342-43 (5th Cir. 1985); Frederick County Fruit Growers Ass'n, 703 F. Supp. 1021, 1031 (D.D.C. 1989), aff'd, 968 F.2d 1265 (D.C. Cir. 1992) ("The terms of a[n] [H-2] job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law."); W. Colorado

16

Fruit Growers Ass'n, Inc. v. Marshall, 473 F. Supp. 693, 696 (D. Colo. 1979) ("clearance order is essentially an offer for a contract of employment").

However, as S&R observes, citations to those "H-2" cases are generally unhelpful because they were decided before the separation of the H-2 program into the H-2A program and the H-2B program. That separation is significant because the current H-2A regulations provide that the required terms of the job clearance order and application shall be the work contract. However, the H-2B regulations contain no such provision. See Olvera-Morales, 246 F.R.D. at 253 ("An H-2B worker . . . has no employment contract or work guarantee."); Garcia, 644 F. Supp. 2d at 719 ("[T]he court declines to apply a unilateral contract analysis to the issue of H-2B Clearance Orders. . . .").

The fact that the H-2B visa regulations do not provide that the terms of the labor certification comprise, or are part of, the foreign workers' contracts, while similar requirements are terms of those contracts under the H-2A visa program, is persuasive evidence that the DOL does not consider the labor certification obligations to be terms of the Plaintiffs' contracts, if any there be. Because the violation of those three terms are the only alleged breaches of the putative contract, Count III must fail for it presents no cognizable breach of contract.

17

S&R also argues that Count III is not really a contract claim, but is instead an attempt to privately prosecute alleged violations of the labor certification requirements, and, says S&R, the applicable regulations create no such private cause of action.

The DOL is authorized to impose administrative remedies, including penalties, on employers who fail to meet conditions of H-2B petitions and who make willful misrepresentations in H-2B petitions. See 8 U.S.C. § 1184(c)(14)(B); Nieto-Santos v. Fletcher Farms, 743 F.2d 638, 641 (9th Cir. 1984) ("[T]here is no evidence that Congress intended to permit private enforcement of the H-2 regulations. . . . [and] there is nothing in the underlying purposes of the legislative scheme suggesting that it would be appropriate to imply a privately enforceable remedy for alien workers."). However, there is nothing in the statute or the regulations that would convert the DOL's enforcement authority with respect to H-2B compliance into a private cause of action for breach of contract. Plaintiffs have cited no authority that it was the intent of Congress to create such a private course of action. Nor could the Court locate any such authority. And, at least one court has declined "to apply a unilateral contract analysis to the issue of H-2B Clearance Orders." See Garcia, 644 F. Supp. 2d at 719. Certainly, Congress is well aware of how to create a private

18

cause of action in its enactments. If Congress chose not to do so, it is not for the courts to create one.

Moreover, Defendants observe "the problematic nature of treating applications for discretionary grants of immigration status or approvals thereof as contracts." Rao v. Covansys Corp., 2007 U.S. Dist. LEXIS 80937, *11, (N.D. Ill. 2007). Namely, "[a] party's agreement to do or refrain from doing something that it is already legally obligated to do or refrain from doing is not consideration." Id. "Any promise to the government that one will not behave in an illegal manner triggers no detriment to the promising party." Id. at *12.

For the foregoing reasons, the Plaintiffs' effort to craft a private right of action under the INA by arguing that S&R's commitments to follow federal regulations were incorporated into a state contract must fail. The motion for judgment on Count III will be granted for this additional reason.

At oral argument, the Plaintiffs represented that discovery has produced evidence of an employment contract and asked for leave to amend the Complaint to plead breach of that written contract. S&R agreed to the oral motion for leave to amend.

## V. Count IV: Third Party Beneficiary Claim

In Count IV, the Plaintiffs allege that the H-2B filings and clearance orders constituted a written contract between

Defendants and the Government as to which the Plaintiffs were third-party beneficiaries. Defendants allegedly "breached their employment contracts with the U.S. Department of Labor" to the detriment of Plaintiffs - purported third-party beneficiaries - by failing to pay Plaintiffs the prevailing wage, failing to provide 40 hours of work, and failing to pay the minimum wage required by FLSA. (Compl. ¶ 81.)

As with Plaintiffs' breach of contract claim, Plaintiffs' third-party beneficiary claim appears to be an attempt to bootstrap a private right of action onto a violation of the H-2B regulations. The Defendants argue that a contract did not exist in the first place, citing Rao for the proposition that obeying the law does not constitute consideration. See supra at 19-20. Defendants further argue that, even if a government contract did exist, courts have not permitted individuals to craft a private right of action by claiming to be third-party beneficiaries of those agreements. See Brug v. Nat'l Coal. for the Homeless, 45 F. Supp. 2d 33, 41-42 (D.D.C. 1999) (noting that plaintiff cannot circumvent the lack of a private right of action by arguing that he is a third-party beneficiary to a government contract).

The Plaintiffs retort that "[Form] ETA 9142 is more than simply an agreement to comply with the law, as Defendants suggest, but is a substantive description of the terms and

20

conditions of the employment offered, which the Department of Labor can accept or reject depending on what those terms are." (Pls.' Resp. at 24.)   Plaintiffs also cite to language in the Federal Register purporting to evidence the contractual nature of the form: "Thus, DOL's issuance of supplemental prevailing wage determinations under the IFR is authorized by the contractual conditions to which the employers agreed when signing ETA Form 9142, Appendix B.1."   79 Fed. Reg. 75179, 75182-83 (Dec. 17, 2014) (emphasis added).

Plaintiffs fail to cite any examples of a third-party beneficiary claim based upon an H-2B certification, and accepting such a theory would pose problems similar to the contract theory Plaintiff advances above.   Even assuming that the certification at issue could be considered a contract between the Defendants and the Government, there is no evidence that these particular individuals were meant to benefit rather than an abstract class of protected persons.   See Brug, 45 F. Supp. 2d at 41 n. 12 ("Third-party beneficiaries of a government contract are assumed to be merely incidental beneficiaries, and may not enforce the contract absent a clear intent to the contrary. . . . Even those courts willing to hold that parties may enforce [an Executive Order] through third-party beneficiary law usually limit their holdings to cases in which the . . . provisions included in the contract were clearly intended to

21

benefit the plaintiff specifically."). For these reasons, Defendants' motion will be granted, and Count IV will be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' RULE 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS (Docket No. 11) will be granted on all counts, with leave to file an Amended Complaint to amend Count III.

It is so ORDERED.

/s/       *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  March 17, 2015

22